John **WILKES**, et al., Plaintiffs,

v.

**HERITAGE BANCORP, INC.,**
et al., Defendants.

**Civ. A. Nos. 90–11151–F, 90–11285–F.**

United States District Court,
D. Massachusetts.

March 4, 1991.

---

Glen DeValerio, Berman, DeValerio & Pease, Boston, Mass., for plaintiffs in No. 90–CV–11151.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, Mass., Howard A. Specter, Specter Law Offices, Pittsburgh, Pa., for plaintiff in No. 90–CV–11285.

Brackett B. Denniston, III, Ellen B. McGinty, Loretta M. Smith, Goodwin, Procter & Hoar, Boston, Mass., for defendants.

MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

## I. INTRODUCTION

Before the Court are plaintiffs' objections to the November 21, 1990 Report and

Recommendation Regarding Defendants' Motions to Dismiss ("Magistrate's Report") issued by Magistrate Michael A. Ponsor.[1] The Magistrate's Report examined the Consolidated Amended Class Action Complaint (September 18, 1990) ("complaint") filed by plaintiffs John Wilkes, Sam Whitehouse and Maryanne Gunther. Count one of plaintiffs' complaint alleges fraud, in violation of federal securities law, by defendants Heritage Bancorp, Inc. ("Heritage" or "the Bank"), and by Heritage bank officials Richard B. Covell, Roy A. Scott, Robert C. Peck, John W. Fridlington, and Fredric E. Schluter, III ("the individual defendants"). In counts two and three of their complaint, plaintiffs claim damages under state law theories of fraud and deceit, and negligent misrepresentation.

The Magistrate found that allegations of fraud contained in count one of plaintiffs' complaint were not stated with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Since plaintiffs based this Court's jurisdiction on the defective federal securities law claim, the Magistrate recommended that this Court allow defendants' motions to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6). The Magistrate also recommended that plaintiffs be allowed leave to amend their complaint once again.

The Court will adopt the Magistrate's recommendation and grant without prejudice defendants' motions to dismiss, and allow the plaintiffs twenty days leave to file another amended complaint.

## II. FACTS

This case is the consolidation of two cases which were originally filed in Boston and then transferred to Springfield. In September 1990, the Court issued a stay of discovery in all proceedings on plaintiffs' motion for class certification, pending the outcome of defendants' motions to dismiss.

Plaintiffs' complaint is brought on their own behalf, and on behalf of a class of those persons who purchased Heritage common stock during the period March 31, 1989 through March 22, 1990. Although the Court has not certified such a class, the term "class period" will be used herein for ease of reference.

Plaintiffs claim they were defrauded as a result of materially false and misleading statements allegedly issued during the class period by Heritage and the individual defendants, in violation of section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b–5 ("rule 10b–5"). Section 10(b) states that it is unlawful for any person:

> to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 makes it unlawful to use:

> any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

Plaintiffs also allege that the individual defendants are liable for the fraudulent conduct alleged in the complaint, pursuant to section 20 of the Act, 15 U.S.C. § 78t. The scope of these securities fraud provisions has been defined by decisions which

---

**1.** Plaintiffs have also requested that the Court hear oral arguments on defendants' motions to dismiss. The Court will deny this request, and rely on the hearing on defendants' motions to dismiss conducted by Magistrate Ponsor on October 3, 1990.

the Court will now apply to plaintiffs' complaint.

## III. DISCUSSION

### A. *Procedural Rules Governing Defendants' Motions to Dismiss*

■ The First Circuit Court of Appeals has provided detailed guidelines and interpretations regarding the adequacy of plaintiffs' complaint. Under Fed.R.Civ.P. 12(b)(6), defendants' motion to dismiss for failure to state a claim upon which relief can be granted should be allowed "only if it appears beyond doubt" that the plaintiffs "can prove no set of facts which would entitle [them] to relief." *Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989), *citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), *Harper v. Cserr,* 544 F.2d 1121, 1122 (1st Cir.1976).

Normally, the Federal Rules of Civil Procedure place "threshold demands on the pleader [which] are low." *Fleming v. Lind–Waldock & Co.,* 922 F.2d 20, 23 (1st Cir.1990). This general acceptance of a plaintiff's complaint is tempered by the requirement:

> that each general allegation be supported by a specific factual basis. The pleadings are not sufficient where the plaintiff rests on "subjective characterizations" or unsubstantiated conclusions. *Dewey v. University of New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Despite the potential ambiguities, this court has plotted the dividing line between pleading adequate facts and inadequate conclusions.
>
> Most often, facts are susceptible to objective verification. Conclusions, on the other hand, are empirically unverifiable in the usual case. They represent the pleader's reactions to, sometimes called "inferences from," the underlying facts. It is only when such conclusions are logically compelled, or at least supported by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability that "conclusions" become "facts" for pleading purposes.
>
> [*Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).]

In addition, the necessary factual averments are required with respect to each material element of the underlying legal theory. *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988).

*Id.* at 23–24.

However, the complaint in this case must do more than cross the low threshold pleading requirements by stating claims which may be supported by logical conclusions. Plaintiffs' complaint makes allegations of fraud, and therefore it must comply with the higher standard set by Fed.R.Civ.P. 9(b) requiring that averments of fraud be "stated with particularity."

> [I]n a general fraud case, Rule 9 "requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980). The major purpose of Rule 9 is to give adequate notice of the plaintiff's claim of fraud. *Id.* at 228–29.
>
> In the context of securities litigation, we have expressed the fear that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence. *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984) (citing *Ross v. A.H. Robins Co.,* 607 F.2d 545 (2d Cir.1979), citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)). In *Wayne,* this court further stated that allegations based on "information and belief," ... do not satisfy the particularity requirement unless the complaint sets forth the facts on which the belief is founded. *Id.* Furthermore, this requirement of pleading supporting facts applies "even when the fraud relates to matters peculiarly within

**1170**

the knowledge of the opposing party." *Id.* at 14. Thus, in the securities context, and in general, this circuit has strictly applied Rule 9(b). *See also Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985) ("in cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action."). . . .

*New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288–89 (1st Cir.1987) (reversing dismissal of RICO mail and wire fraud case and remanding for additional discovery). "In any event, mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk,* 775 F.2d at 444. These authorities lead the Court to conclude that plaintiffs' claim of federal securities law violations must be dismissed.

**B.  Plaintiffs' Federal Securities Law Allegations**

Plaintiffs' complaint refers to numerous blocks of text and quotations from documents and statements issued by Heritage during the class period. These excerpts, frequently reiterated, are used as support for allegations that Heritage and the individual defendants "employed devices, schemes and artifices" and knowingly or recklessly made "false and misleading statements" and omitted material information, in order to inflate the market price of Heritage common stock and defraud plaintiffs. Complaint at ¶¶ 52–68. The Court will analyze plaintiffs' assertions in the

context of three categories of information which were issued by the defendants.

**1.  Defendants' Statements Regarding Loan Loss Reserve**

■   Plaintiffs claim that the precipitous rise in the Bank's loan loss reserves during the class period is an indication of fraud, and of misleading statements and omission of material fact involving the Bank's financial statements. Plaintiffs theorize that Heritage "manipulated its provision for loan losses to create the illusion of profitability while the collectibility of its loan portfolio rapidly deteriorated." Complaint at ¶ 48; *see also* complaint at ¶ 54(b) which is set out in note 4, *infra.*

A loan loss reserve " 'is a reserve of funds set aside to cover possible losses from future loan defaults.' " *Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1125 Civ. Action 90–0302P, slip op. n. 2 (D.R.I.1991), *quoting* Defendants' Brief at 2 n.*, citing* J. Kolvert, *Accounting for Banks,* §§ 2.02[3], 3.05[5], and 8.02[2] (1989). In the instant case, there is no dispute that the amounts of Bank funds designated as loan loss reserves were accurately reported and disclosed by Heritage. Rather, plaintiffs claim that defendants concealed the Bank's problems with its loan portfolio by improperly calculating the amounts which were placed in the loan loss reserve.

As evidence of this manipulation and concealment, plaintiffs point to the series of statements the Bank filed with the Securities and Exchange Commission, and sent to its shareholders. This series of statements charts the rapidly rising level of loan loss reserves which were needed to cover increasing losses from bad loans.[2]

**2.** Complaint at ¶ 21, *quoting* April 1989 Letter to Stockholders which reported a $1.1 million increase in provision for possible loan losses; Complaint at ¶ 22, *quoting* June 19, 1989 announcement that Heritage would "increase its loan loss reserves 'to more clearly reflect current conditions in the New England real estate market.'"; Complaint at ¶¶ 23–24, *quoting* August 15, 1989 Form 10–Q filed with the Securities and Exchange Commission, which reported an *increase* in the Bank's:

loan loss allowance from $7.7 million at the end of the first quarter to $16.5 million on

June 30, 1989. The increase to the reserves was attributable to non-performing loans totalling $32.2 million or 1.86% of Assets, compared with $2.0 million or .13% of assets at June 30, 1988, current conditions in the New England real estate market and in anticipation of a slowing national and regional economy. This action resulted in a loan loss allowance of 1.09% of total loans at June 30, 1989 as compared to .46% of total loans at June 30, 1988.... Continued deterioration in the real estate market may result in increases in the

Although the information about the Bank's rapidly rising loan loss reserve is restated in numerous paragraphs throughout plaintiffs' complaint,[3] such information does not add up to an allegation of fraud which satisfies Fed.R.Civ.P. 9(b). *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d at 228; *Wayne Investment, Inc. v. Gulf Oil Corp.*, 739 F.2d at 13; *Hayduk v. Lanna*, 775 F.2d at 443–44; *New England Data Services, Inc. v. Becher*, 829 F.2d at 288–89. The loan loss reserve allegation is conclusional and does not state the content of the allegedly false representations and material omissions with the particularity required by Fed.R.Civ.P. 9(b).

■ For the sake of comparison, it may be possible to view the loan loss reserve allegation as a claim involving internal corporate mismanagement. However, mismanagement is not a violation actionable under Rule 10b–5. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). In *Santa Fe*, the Supreme Court discussed policy considerations which "weigh heavily against permitting a cause of action under

Rule 10b–5" for an alleged breach of corporate fiduciary duty. *Id.* at 477, 97 S.Ct. at 1303. Accepting plaintiffs' loan loss reserve allegation as an adequate Rule 10b–5 claim would require this Court to accept questionable corporate business judgments as the basis for securities fraud suits brought by stock purchasers who become disappointed by their investments. This would require the Court to "recognize a cause of action ... to serve what is 'at best a subsidiary purpose' of the federal legislation." *Id.* at 478, 97 S.Ct. at 1303, *quoting Cort v. Ash*, 422 U.S. 66, 80, 95 S.Ct. 2080, 2089, 45 L.Ed.2d 26 (1975). This would also open up a vast new area of federal scrutiny of "corporate conduct traditionally left to state regulation." *Id.*, 430 U.S. at 478, 97 S.Ct. at 1303. The Court is not willing to take such a step.

### 2. Defendants' Statements Regarding Banking Practices, Policies and Personnel

■ Plaintiffs allege that Heritage covered up practices, policies and personnel which were inadequate to manage the Bank's commercial loan portfolio.[4] Plain-

---

Bank's levels of non-performing assets and could require further additions to the allowance for possible loan losses, with a corresponding negative impact on future earnings. *Id.*

3. Complaint at ¶ 26, repeating and restating loan loss reserve information contained in ¶ 23; Complaint at ¶ 27, *quoting* July 26, 1989 Second Quarter Report to Shareholders which repeats and restates loan loss reserve information contained in ¶¶ 23 and 26; Complaint at ¶ 28, *citing* September 29, 1989 announcement that the bank would increase loan loss reserves to $24.7 million; Complaint at ¶ 30, *quoting* October 23, 1989 Letter to Our Stockholders which reported loan loss information contained in ¶ 28; Complaint at ¶¶ 32–33, *quoting* November 15, 1989 Form 10–Q which repeats and restates the same loan loss reserve information cited in ¶¶ 28 and 30; Complaint at ¶ 35, *citing* December 14, 1989 announcement which warned that the fourth quarter would end with a net loss because of increases in the loan loss reserve; Complaint at ¶ 36, *citing* January 25, 1990 announcement that loan loss provision would be $30.5 million for the fourth quarter; Complaint at ¶ 41, *quoting* Form 10–K which stated that "substantial increases in the provision for loan losses" would be required in 1990; Complaint at ¶ 44, *citing* March 29, 1990 announcement that $20 million would be added to loan loss reserves.

4. In summary, plaintiffs allege that defendants did not reveal:
(a) that in its effort to rapidly expand its business and to inflate on a short-term basis its reported earnings, Heritage had over-concentrated its portfolio in commercial loans, thus exposing the Bank to serious risk of material losses, only a small percentage of which had been written off or reflected adequately in its allowance for possible loan losses;
(b) that its provision for possible loan losses and its allowance for possible loan losses were not maintained at adequate levels in light of economic conditions prevailing in the areas of the Bank's loan concentration and the concomitant high risk of noncollectability of a significant portion of Heritage's commercial loans;
(c) that with respect to these loans, Heritage's credit review and authorization standards and policies and systems of internal controls to assure adequate collateralization and prompt recognition and accounting for problem loans were not functioning adequately or were being disregarded, not followed or circumvented by senior officers of the Bank in order to maintain artificially high loan and earnings growth;
(d) that Heritage's lending practices and controls had become unmanageable and that

tiffs acknowledge that during the years 1983 to 1988, prior to the class period, the Bank's residential loan portfolio had decreased from 87.1% of total loans to 41.4%. At the same time, commercial lending increased from 5.7% of the total loan portfolio to 46.9%, with commercial real estate loans increasing to 30.3% of the total loan portfolio. Complaint at ¶ 16. Even though the ratio of residential lending, in comparison to more speculative commercial lending, had shifted dramatically prior to the class period, and the Bank's heavy involvement in commercial loans had been disclosed, plaintiffs contend that defendants "were aware of and failed to disclose the serious problems with the quality of Heritage's loan portfolio" and that defendants "continued to make a substantial number of high risk loans." Complaint at ¶ 25. However, plaintiffs' complaint does not mention any specific loans which would adequately particularize the fraud allegedly foisted on shareholders by the Bank, and thereby raise an allegation of conduct above and beyond that of mismanagement.

Instead, plaintiffs make the conclusory assertion that an inordinate number of loans went bad during the class period, and therefore the Bank had "grossly violated its own highly touted policy" for making loans and managing its loan loss reserve. Complaint at ¶¶ 46–48. As an example of this "touting" of "prudent and conservative lending practices," plaintiffs allege that Heritage:

> made the following statements regarding the Bank's loan policies:
>
> The Bank's loan underwriting policies are designed to provide efficient customer service while maintaining a high level of creditworthiness in its loan portfolio. Loans which conform to established underwriting standards as set by the Board of Directors of the Bank are approved by individual loan officers up to prescribed limits set by the Board. Loans which do not conform to established underwriting standards or are above the prescribed limits for individual loan officer approval are reviewed by the Bank's Senior Loan Committee and presented to the Board of Directors for approval and/or ratification.
>
> . . . .
>
> It is Heritage's policy to monitor its loan portfolio so as to recognize problems [sic] loans at an early point and thereby minimize losses. As a matter of policy, Heritage commences collection procedures when a loan payment is more than 30 days past due. It is the general policy of Heritage to discontinue accrual of interest or principal is [sic] 90 days or more past due, with the exception of loans guaranteed by the United States Government.
>
> 18. On the subject of its Corporate lending Department and its activities, Heritage stated in its 10–K:
>
> As part of its long range plan to diversify and expand its commercial loan portfolio and to develop relationships with small and medium-sized businesses within its market area, Heritage has established a Corporate Lending Department. The Corporate Lending Department is managed by loan officers with prior commercial lending experi-

commercial lending officers were engaging in high-risk and speculative loan and/or refinancing transactions, that the Bank was originating or purchasing loans of inferior creditworthiness, and that these activities were not being adequately supervised, controlled, or directed by the Bancorp's management or Board of Directors, including the Individual Defendants.

(e) that Heritage's management was inadequate to supervise and control properly the lending and workout activities in which the Bank had engaged;

(f) that Heritage's earnings, assets, and net worth were improperly and materially overstated and inflated throughout the Class Period due to, *inter alia,* grossly inadequate provisions for loan loss reserves;

(g) that Heritage continually understated non-performing loans and failed to provide adequate loan loss reserves for problem loans promptly and properly, and instead granted extensions, further credits, and other beneficial terms to its problem loan customers (and/or their successors) in order to postpone improperly the recognition of said problem loans in the disseminated financial statements of the Bank.

Complaint at ¶ 54(a)–(g).

ence at major regional commercial banks.

....

Loans generally are secured by inventory, accounts receivable, multi-family or commercial real estate or personal guarantees. To assure careful oversight and management of its commercial loan portfolio, Heritage has limited its commercial loan activity primarily to its market area and contiguous communities. In addition, Heritage has established a practice of not making significant unsecured commercial loans and carefully enforces procedures in reviewing commercial loan applications....

Complaint at ¶¶ 17–18, *quoting* Form 10–K for fiscal year ended December 31, 1988, filed in April 1989. To bring the allegation regarding touting of practices, policies and personnel within the ambit of federal securities law, plaintiffs allege that the 10–K report and other statements were misleading, and that Heritage embarked on a coverup of inadequate policy, procedures and personnel so as to inflate the value of Heritage stock. Complaint at ¶¶ 49–53.

Yet, plaintiffs' complaint does not give details of a single loan or transaction which was imprudent and made in violation of a standard banking procedure which had been "touted" by Heritage. *Cf. Hurley v. Federal Deposit Insurance Corporation,* 719 F.Supp. 27, 29 (D.Mass.1989) (complaint gave details of specific bank practices and of bank loans allegedly benefiting bank officers). Plaintiffs' counsel was invited to provide particulars of the alleged cover up of bad loans during a hearing on defendants' motions to dismiss conducted by the Magistrate. Counsel merely repeated the allegations in the complaint. Transcript of the Hearing on Motion to Dismiss (October 3, 1990) at 7, 41–42. Again, plaintiffs have not particularized the misleading content of the allegedly false representations. *See McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d at 228; *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d at 13; *Hayduk v. Lanna,* 775 F.2d at 443–44; *New England Data Services, Inc. v. Becher,* 829 F.2d at 288–89.

In opposing defendants' motions to dismiss, plaintiffs argue that they should be allowed to develop the particulars of their complaint during discovery, since only the Bank has details of the loans and procedures which underlie plaintiffs' allegations of fraud. However, the particularity requirement of Fed.R.Civ.P. 9(b) must be applied to plaintiffs' complaint, even if the alleged fraud involves matters peculiarly within the knowledge of the Bank. *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d at 14.

The First Circuit did make exception to this strict requirement in *New England Data Services, Inc. v. Becher,* 829 F.2d at 290, a RICO mail and wire fraud case involving an alleged sham securities transaction by promoters of the Ginsu kitchen knife. However, in that case, the plaintiffs alleged the "strong facts" that the defendants had conspired to sell all their stock in Ginsu and International Broadcast Industries, Inc. in order to bankrupt the companies and escape paying a state court judgment which the plaintiffs had obtained. *Id.* at 287, 292. With regard to "the details of just when and where the mail or wires were used" in a RICO case, the First Circuit held "that dismissal should not be *automatic* once the lower court determines that Rule 9(b) was not satisfied." *Id.* at 290 (emphasis in original). In such a case, a district court "should make a *second* determination as to whether the claim as presented warrants the allowance of discovery...." *Id.* (emphasis in original); *cf. Boyle v. Merrimack Bancorp, Inc., et al.,* 756 F.Supp. 55, 60 C.A. No. 90–11260, slip op. at 14 (D.Mass.1991) (Young, D.J.) (applying the *second* discovery determination ordered for the RICO claim in *New England Data Services, Inc.* to a bank stockholders' rule 10b–5 case).

In contrast to the specific sham transaction and RICO mail and wire fraud violation alleged in *New England Data Services, Inc. v. Becher,* 829 F.2d at 287, plaintiffs claim that the announcement of housecleaning conducted by the Bank in 1990 amounts to a belated disclosure that the Bank's "practices, policies and personnel

were a major factor in the extensive losses incurred by the Bank." Complaint at ¶ 40. In plaintiffs' view, the Heritage annual report for 1989 is equivalent to such an admission because it:

> disclosed that Heritage had belatedly begun efforts to improve its lending procedures:
>
>> Heritage has refined its program to analyze and monitor credit and improve asset quality. This approach includes a newly formulated, hands-on loan policy that, we believe, will make it less likely that the many problems faced in 1989, and those which we continue to face in 1990, will affect loans originated in the future.
>>
>> . . . .
>>
>> During 1989 we modified the Bank loan policy to reduce our aggregate single-borrower limit to $10 million from $15 million and expect that most new lending relationships in 1990 will be well below this level.

*Id., quoting* 1989 Annual Report. As further proof that Heritage covered up inadequate personnel during 1989, plaintiffs refer to the announcement of March 2, 1990 that defendants Scott, Peck and fifteen other employees were resigning or leaving their positions. Complaint at ¶ 38; *see also* Complaint at ¶¶ 41–43 (disclosing operational changes). These management and operational changes made by the Bank in 1990 do not adequately support plaintiffs' allegations of fraud.

3. **Defendants' Statements Regarding the Bank's Financial Condition and Optimistic Predictions of Future Earnings**

■ Plaintiffs allege that defendants engaged "in an effort to assure investors of Heritage's strong financial condition and promising financial performance." Complaint at ¶ 63. Plaintiffs allege this effort was undertaken "to continue the illusion of Heritage's substantial, sustainable, profitable growth" and included "financial statements, reports and releases, as particularized herein, which were materially false and misleading." Complaint at ¶ 64. The statements "particularized" in plaintiffs'

complaint include the 10–K report for the year 1988, which stated that all of the Bank's commercial real estate loans:

> are located in the New England Market, and most are in Massachusetts. While the condominium market in New England has been experiencing a decline in sales activity, the major portion of the Bank's portfolio is performing according to original loan terms. However, the Bank expects its delinquency rate to show some deterioration due to the current unfavorable conditions in the New England real estate market.
>
> . . . .
>
> While the risks on commercial loans are typically greater than on residential mortgage loans, Heritage has experienced no significant losses on such loans to date.

Complaint at ¶ 18, *quoting* 10–K report for 1988 filed in April 1989. Reference is made in the Complaint to the 10–Q report filed in May 1989 which reported an increase in net income during the first quarter, and a dividend of .35 per share, but also disclosed the Bank's increase in loan loss reserves. Complaint at ¶ 19–20 *quoting* 10–Q report of May 1989.

Plaintiffs also allege that the July 1989 Letter to Shareholders "couched" the bad news about the Bank's losing second quarter, and was "intended to create the impression that Heritage had solved its problems and its future prospects were favorable." Complaint at ¶ 27. However, the same letter stated that the need to increase the loan loss reserve was "not good news to stockholders." *Id.* Additionally, a 10–Q report filed in August 1989 disclosed the second quarter loss and increase in loan loss reserves due to the New England real estate market, and also included the warning that " '[c]ontinued deterioration in the real estate market may result in increases in the Bank's levels of non-performing assets and could require further additions to the allowance for possible loan losses, with corresponding negative impact on future earnings.' " Complaint at ¶¶ 23–24, *quoting* 10–Q report of August 15, 1989. In September 1989, the bank announced a

" 'significant increase' in non-accruing commercial real estate loans" during the third quarter. Complaint at ¶ 28, *quoting* September 29, 1989 letter.

Plaintiffs point to a letter written by Heritage to shareholders in October 1989 which they claim "created a false impression that Heritage's problems were behind it and that the future prospects were bright." Complaint at ¶ 30. This letter made a weak attempt to distract readers from the disclosure that Heritage was posting an $8.9 million third quarter loss.

> "Operating earnings in the third quarter were positive exclusive of the provision for loan losses, reflecting a marked improvement in operating efficiencies. However, the Company provided $17 million to the loan loss reserve, increasing the ratio of reserves to nonperforming loans to 35.49% and to gross loans of 1.64%, resulting in a loss for the quarter of $8.9 million.
>
> Much has been written about loan problems in New England and while we have experienced our share, we are now more optimistic about a positive turn of events. Our objective has been to identify loan problems and to then take the action necessary to correct each situation as quickly as possible.
>
> Our attention has been directed to restructuring and loan workout situations which are expected to produce positive results in the future. As the present cycle reverses, many of the presently troubled loan situations are expected to be reverses [sic]. We look for the cycle to shift positive in 1990."

*Id., quoting* October 23, 1989 Letter to Our Stockholders. Plaintiffs also refer to a statement that the Bank was "aggressively pursuing workout strategies with respect to nonperforming assets in an effort to resolve these problems as expeditiously as possible, while simultaneously minimizing losses to the company." Complaint at ¶ 31, *quoting* October 27, 1989 statement.

Plaintiffs allege that the November 1989 10-Q report was misleading, even though it disclosed the third quarter loss and predicted that "continued deterioration in the real estate market could result in further increases in the Bank's levels of nonperforming assets." Complaint at ¶ 33, *quoting* 10-Q Report filed on November 15, 1989. The Bank's unfavorable financial condition was also obvious in subsequent reports and statements. *See* Complaint at ¶¶ 34–39.

The Court does not find that these statements, when read in context, provide the particularity required to support an allegation that Heritage mislead investors or made material omissions of fact. *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (disclosure of failed product was not so incomplete as to mislead); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) (allegations that "rosy" bank statements were misleading did not sufficiently plead federal securities fraud). Plaintiffs' annoyance with the sanitized language and corporate puffery contained in these documents is understandable, but plaintiffs have failed to state facts with the particularity required by Fed.R.Civ.P. 9(b) to support their allegation that Heritage issued materially false statements or omitted material facts.

It is also worthy of note that plaintiff Wilkes purchased his Heritage stock on July 31, 1989, after the Bank had reported the problems with its large commercial loan portfolio and the unfavorable real estate market. Complaint at ¶ 4. Even more striking are the facts that plaintiff Gunther purchased her Bank stock in November 1989 and plaintiff Whitehouse purchase his stock in December 1989, following additional unfavorable disclosures. *Id.*

### 4. Conclusion

Though the plaintiffs' allegations of federal securities law violations are rephrased and repeated in numerous combinations, the allegations are conclusory, do not state a claim upon which relief can be granted, and do not state the content of the alleged false representations with the particularity required by Fed.R.Civ.P. 9(b). *Accord Haft v. Eastland Financial Corp.*, 755 F.Supp. 1123 (D.R.I.1991); *Ackerman v. Bankworcester Corp.*, 751 F.Supp. 11, 12 (D.Mass.1990). Since there is no basis for

the plaintiffs' federal securities fraud claim, the Court does not reach the individual defendants' motion to dismiss or strike plaintiffs' allegations that the individual defendants are liable for fraudulent conduct alleged in the Complaint.

The Court will adopt the Magistrate's recommendation that the plaintiffs be allowed leave to amend their complaint for a second time, in order to give them opportunity to plead facts which would particularize the fraudulent content of the statements which they allege were in violation of federal securities law.

### C. Plaintiffs' Common Law Claims for Fraud and Negligent Misrepresentation

The Court does not reach the merits of counts two and three, which allege state common law claims for fraud and negligent misrepresentation. Pendent jurisdiction regarding these claims is a matter of discretion. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see* Magistrate's Report at 25–26. The Court declines to exercise that discretion, and the state law claims will be dismissed.

### IV. CONCLUSION

The Court ADOPTS the Magistrate's Report and GRANTS, WITHOUT PREJUDICE, defendant's motions to dismiss. Plaintiffs' request for oral argument is DENIED. Plaintiffs are ALLOWED leave to file a second amended complaint within twenty days of issuance of this Memorandum and Order.

It is So Ordered.