**Marvin J. FOX, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**EQUIMARK CORPORATION, Alan S. Fellheimer, Judith E. Fellheimer, Claire W. Gargalli, Michael E. Jehle, and Robert C. Payment, Defendants.**

Civ. A. No. 90–1504.

United States District Court, W.D. Pennsylvania.

May 22, 1991.

Gene I. Mesh, Howard A. Specter, Gene Mesh & Associates, Cincinnati, Ohio, for plaintiffs.

David A. Brownlee, Terry Budd, Kirkpatrick & Lockhart, Pittsburgh, Pa., for Equimark Corp.

George M. Medved, Gordon W. Schmidt, Deopken Keevican Weiss & Medved, P.C., Pittsburgh, Pa., for Gargalli, Jehle and Payment.

## OPINION

COHILL, Chief Judge.

Plaintiffs, purchasers of Equimark Corporation stock, brought this class action against Equimark and a number of corporate officers, charging them with securities fraud. Presently before the Court are Motions to Dismiss filed by all defendants. Because plaintiffs have failed to comply with the requirements for pleading fraud, we will dismiss their amended complaint, with leave to file a second amended complaint.

*Background*

Plaintiffs claim status as purchasers of Equimark stock during the proposed class period, September 12, 1987 to September 12, 1990. They seek to represent all purchasers of Equimark stock during that period.

Defendants are Equimark, a Delaware corporation with corporate offices in Pittsburgh, and the following persons, whom the plaintiffs claim held these positions as corporate officers during the class period: Alan S. Fellheimer, Chairman of the Board and Chief Executive Officer of Equimark; Judith E. Fellheimer (wife of Alan Fellheimer), President and Executive Vice President of Equimark and Chairman of the Board of Equimanagement, Inc., an Equimark subsidiary; Claire W. Gargalli, Chief Operating Officer of Equimark, a director of Equimark, and an officer of various Equimark subsidiaries; Michael E. Jehle, Chief Financial Officer, Secretary, and an Executive Vice President of Equimark; Robert C. Payment, Senior Vice President and Controller of Equimark. Complaint ¶¶ 5–10.

In Count I, plaintiffs charge defendants with securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. Complaint ¶ 60. Count II is a state-law claim for negligent misrepresentation.

Plaintiffs charge that throughout the class period, defendants made false and misleading statements by portraying Equimark as a thriving corporation that was well prepared for a downturn in the economy, when in fact loan loss reserves were not adequate to withstand the loan losses that began in 1990. The following excerpts from the consolidated amended class action complaint are representative of plaintiffs' allegations:

18. ... During [the expansion period beginning in 1987], Equimark disregarded the need for and, therefore, lacked adequate management policies, procedures and controls to assure that its acquisitions would be profitable and that its consequential loan portfolio would be comprised of economically sound, well-secured credits. In connection therewith, and unbeknownst to the investing public, Equimark's subsidiaries, both old and newly-acquired, made increasingly imprudent loans and investments which were not economically justifiable and which greatly increased Equimark's profitability for incurring losses thereon as a result of default.

⋅ ⋅ ⋅ ⋅ ⋅

19. Throughout the Class Period, in public pronouncements at Equimark's annual meeting of shareholders, in filings with the SEC, in Annual and Quarterly Reports, and statements and releases disseminated to the investment community, defendants portrayed the Company in glowing terms, with great prospects for future growth and earnings....

⋅ ⋅ ⋅ ⋅ ⋅

21. Throughout the Class Period, however, as part of the scheme alleged herein, defendants misrepresented and concealed the deterioration of the quality of Equimark's loan portfolio, concealed and misrepresented the likelihood of huge in-

creases in non-performing assets, concealed the failure to set appropriate loan loss reserve levels on loans experiencing problems, concealed the failure to timely charge-off assets on which substantial losses were virtually certain in light of the facts known or available to them and misstated expansion prospects.

. . . . .

34. On July 26, 1988, in a press release, Defendants Alan and Judith Fellheimer announced that they "have access to a capital pool of a half-billion dollars—and if the deal's right, more." This announcement was intended to convey to the market that Equimark management and its subsidiary EquiManagement, Inc. had unique skills and great success in turning around troubled banking institutions.

35. In a press release issued on October 17, 1988, Defendant Equimark announced its consolidated net income for the third quarter of 1988. Equimark announced that its earnings were "a record high for a quarterly period and an increase of ... 38.1 percent over consolidated net income ... in the third quarter of 1987." In announcing these record earnings, defendants induced the market and the public into believing that Equimark's provisions for possible loan losses remained under control and a small percentage of the total loans outstanding.

. . . . .

38. In its Annual Report for 1988, ... [Equimark] stated that the reserve at December 31, 1988 was considered adequate to absorb future credit losses of Equimark. The 1988 Annual Report created the false impression that the financial quality of Equimark was extremely strong, and that any problems in the portfolio were adequately reserved. The annual report was materially misleading for the reasons set forth above, and by reason of the failure to disclose that increases in charge-offs, loan loss provision and nonperforming assets were virtually certain.

. . . . .

46. The 1989 Third Quarter Report which was filed with the SEC and disseminated to the investing public on or about November 6, 1989, stated that reserves for loan losses at September 30, 1989 was $40.908 million, or 1.47% of loans outstanding. This compared with reserves at December 31, 1988 of $36.617 million, or 1.50% of loans. Defendants stated that:

> [a]s the result of effective ongoing loan reviews, Equimark has been able to recognize the signs of a weakening economy and has detected the early symptoms of credit and collection problems.

. . . . .

48. Equimark continued to portray the financial condition and future prospects of Equimark and its subsidiaries in a falsely optimistic manner in its Form 10–K filed with the SEC for year ending December 31, 1989.

. . . . .

> A softening of the commercial real-estate market in the Northeast (and, to a lesser degree, in Western Pennsylvania) was felt through an increase in non-performing loans, particularly at Liberty. As a result of ongoing loan reviews, however, we recognized the early symptoms of collection problems and acted more quickly than many of our peers to implement strategies and recovery procedures and tighten credit standards.
>
> With solid primary capital protection plus our proven expertise in loan work-outs, both Equibank and Liberty Bank are well-positioned to ride out the softening economy in our region and achieve growth during the eventual recovery.

. . . . .

49. Equimark's 1989 Annual Report stated that consolidated reserves for possible loan losses totaled $41.955 million, or 1.48% of loans outstanding at December 31, 1989. The Report stated that:

> [t]he adequacy of the reserve for possible loan losses is evaluated on a quar-

terly basis by senior management. The evaluation is based on internal loan reviews, delinquency trends, changes in the composition and levels of various loan categories, historical loss experience and current economic conditions. Management considers the reserve at December 31, 1989 to be adequate to provide for future credit losses inherent in the present loan portfolio.

50. In a press release dated April 17, 1990, Equimark reported its financial results for the first quarter of that year. Equimark announced that it had suffered a consolidated net loss of $15,447,000 or $1.38 per common share for the quarter ended March 31, 1990. The corporation's provision for possible loan losses was $24,526,000 in the first quarter of 1990 as compared to $6,715,000 in the first quarter of 1989. As a percentage of average loans outstanding, the total provision for possible loan losses was 3.52% in the first quarter of 1990 and 1.07% in the first quarter of 1989. Despite these figures, Defendant Alan Fellheimer emphasized in the press release that Equimark's financial position at March 31, 1990 remained strong and reiterated that the first quarter loss represented a temporary setback in Equimark's five year record of financial improvement.

Plaintiffs allege that a press release dated July 19, 1990 reported further losses "equal to a net loss per common share of $1.38," or $2.74 per share for the first six months of 1990. Plaintiffs allege that Equimark increased its loan loss provision in the second quarter of 1990 to $27,151,000. In August, plaintiffs allege, Equimark reported that its loan loss provision had increased to $54.121 million, or 2.18% of loans outstanding. In September, 1990, "Equimark announced that it would not pay the quarterly dividend on the common stock." Complaint at ¶¶ 52–54.

The statements made by defendants concerning the Company's reserves for loan losses, as set forth herein in paragraphs 25 through 53, were materially false and misleading at the time they were made due to the fact that the reserves for loan losses were not adequate at the time they were reported, and were known by the defendants to be inadequate. Complaint at ¶ 56.

*Discussion*

■ On a motion to dismiss, the burden of showing that the complaint is insufficient falls on the moving party. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980). In general, "a complaint will not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* But Federal Rule of Civil Procedure 9(b) adds a special pleading requirement that plaintiffs here must comply with to withstand a motion to dismiss. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent knowledge, and other condition of mind of a person may be averred generally." This requirement applies to allegations of securities fraud. *Recchion v. Westinghouse Electric Corp.*, 606 F.Supp. 889, 894 (W.D.Pa.1985).

The particularity requirement of Rule 9(b) has three purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987) (citations omitted). *Accord, Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

Courts often relax the requirement of Rule 9(b) when knowledge of the fraud is particularly within the control of the defendant since a strict application prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99–100 (3d Cir.1983). "[F]ocusing exclusively on

[Rule 9(b)'s] 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Id.* at 100.

██ Thus, courts must strike a balance between avoiding overly strict pleading requirements and preventing unfounded "strike" suits. But "even under a nonrestrictive application of the rule, ... [pleaders'] allegations must be accompanied by a statement of the facts upon which the allegations are based." *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989).

In their complaint, plaintiffs allege that during the class period Equimark made "increasingly imprudent loans" and kept a loan loss reserve that was too low. Plaintiffs allege that defendants committed securities fraud under § 10(b) and Rule 10b–5 by making overly optimistic projections and not revealing Equimark's true loan situation to the investing public. In addition, plaintiffs allege fraud in that Equimark represented that its management had special and unique skills for managing problem loans and weathering hard economic times. We must decide whether these allegations are sufficient under Rule 9(b) to constitute a proper pleading of securities fraud.

In *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir.1990), the Court of Appeals for the Seventh Circuit explored the requirements of 9(b) in a securities fraud case brought against the accounting firm for a financially distressed bank. Investors in Continental Illinois Bank lost most of the value of their stock when the bank lost large amounts of money in the 1980's. Among the resulting litigation was an action against Ernst & Young, an accounting firm, for securities fraud. The court described the facts as follows:

> Continental got into trouble when risky loans did not pay off. During the early 1980s Continental identified ever-larger volumes of nonperforming loans and established reserves. Almost every financial report announced a higher reserve than its predecessor. The gist of the DiLeos' complaint is that Continental did not increase its reserves fast enough. The central allegation of the complaint ... is that before the class members bought their stock [the accounting firm] 'became aware that a substantial amount of the receivables reported in Continental's financial statements were likely to be uncollectible.' *Id.* at 626.

The appellate court upheld the dismissal of the complaint because it did not "give examples of problem loans that [the firm] should have caught, or explain how it did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate." *Id.* Although the complaint quoted figures from an annual report and alleged that the figures materially understated bad loans and non-performing loans, the court found the allegations insufficient because plaintiffs had failed to provide "a single concrete example." *Id.* at 626–27.

The court noted that "[s]ecurities laws do not guarantee sound business practices and do not protect investors against reverses." *Id.* at 627. To allege securities fraud successfully, investors must "distinguish their situation from that of many others who are adversely affected by business reverses." *Id.*

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.... Rule 9(b) required the district court to dismiss the complaint, which discloses none of the circumstances that might separate fraud from the benefit of hindsight. *Id.* at 627–28.

The allegations made in the instant case resemble the allegations found insufficient in *DiLeo*. According to the complaint, Equimark put forth glowing reports of its financial condition and prospects for future growth up until April of 1990. It told investors, through press releases, annual reports, and other documents, that its loan loss reserves were adequate, its assets sound, and its management particularly capable of "turning around" troubled banks and managing troublesome loans. Then, starting with an April 17, 1990 press release, Equimark began announcing a series of net losses in profits and increases in its loan loss reserves. Plaintiffs allege that the earlier reports were false and misleading in that the loan loss reserves were not adequate at the time and that Equimark knew the reserves to be inadequate.

However, plaintiffs do not specify *how* Equimark knew the reserves to be inadequate or *why* it should have increased its reserves earlier. Like the plaintiffs in *DiLeo*, plaintiffs here present descriptions of the situations before and after the financial reverses and allege that the difference must be due to fraud. Plaintiff's allegations are insufficient since they give no "facts suggesting that the difference is attributable to fraud." *DiLeo*, 901 F.2d at 627. Their allegations amount to no more than speculation that fraud may have been committed. "A complaint alleging fraud should be filed only after a fraud is *reasonably* believed to have occurred; it should serve to seek redress for a wrong, *not to find one.*" *Clinton, Hudson & Sons v. LeHigh Valley Co-op. Farms*, 73 F.R.D. 420, 424 (E.D.Pa.1977) (quoting *Segal v. Gordon*, 467 F.2d 602, 607–08 (2d Cir.1972), *aff'd*, 586 F.2d 834 (3d Cir.1978) (emphasis in *Clinton*).

Perhaps the strongest indication that fraud was committed is that the press release announcing the first reversal in Equimark's fortunes came less than three weeks after the March 29 release of Equimark's 1989 annual report, in which Equimark declared that it had "acted more quickly than many of [its] peers" to deal with "the early symptoms of collection problems," and was "well-positioned to ride out the softening economy in our region." Complaint ¶ 48.

The inference of fraud which plaintiffs wish us to draw from the timing of these statements is insufficient to comply with the demands of Rule 9(b). First, although the annual report was released on March 29, 1990, it no doubt purported to describe the corporation's financial condition as of December 31, 1989. It takes time for a company to compile its end-of-year data, write the accompanying text, send the information to the printer, proofread the printer's galleys, and print the final copies. Even if Equimark officials had realized on March 29 the full extent of its collection problems so far that year, they still could have believed that Equimark was still "well-positioned" to absorb the setback, or at least that that was an accurate statement as of December 31, 1989. In fact, Equimark's 1990 First Quarter Report filed May 11, 1990, while reporting a loss and an increase in reserves, still maintained that the corporation was "positioned to ride out the soft Pennsylvania and regional economy." Complaint ¶ 51.

In any event, the mere implication of fraud made from the timing of public statements is not enough to meet 9(b)'s particularity requirement for pleading fraud.

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence. Recklessness or fraud in making loans is not the same as fraud in discovering and revealing that the portfolio has turned sour.

*DiLeo*, 901 F.2d at 624. *See also, Driscoll v. Landmark Bank for Savings*, 758 F.Supp. 48 (D.Mass.1991) ("the inference one may draw from the timing of the public statements and releases is not sufficient, without additional supporting facts and cir-

cumstances, to withstand the strict requirements of Rule 9(b).").

■ Plaintiffs' allegations of fraud can be grouped into two categories. The first category, relating to loan loss reserves, includes allegations that Equimark made material misrepresentations and omissions as to the adequacy of loss reserves, the quality of their loan portfolio, and the dollar amount of non-performing loans. The second category covers those allegations that Equimark represented that its management had special and unique skills for managing problem loans and weathering an economic recession.

We turn initially to the first category of allegations. Under applicable law, plaintiffs' complaint fails to set forth sufficient facts supporting a claim of fraud as to bad debt reserves to survive a motion for dismissal under 9(b). In *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96 (3d Cir.1983), the plaintiffs alleged fraud on the ground that the defendant had understated reserves it should have accrued for bad debts.

> [The complaint's] defect is the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices. Those reserves were estimates or predictions of the likely collection or liquidation experience of the Trust in the future. They could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. What those practices are and how they were departed from is nowhere set forth. *Id.* at 100.

To the extent plaintiffs here allege fraud due to Equimark's failure to disclose that loan loss reserves were inadequate or that the quality of the asset base was poor, the complaint is inadequate under the *Christidis* standard because it fails to explain the manner in which reserves were improperly established or falsely disclosed. Failure to predict the severity of future economic downturns is not necessarily fraud.

■ As for the second category of allegations—relating to claims of special and unique management skills—plaintiffs have likewise failed to plead sufficient facts. In *Santa Fe v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977), the United States Supreme Court drew a distinction between allegations of misrepresentation and deception actionable under securities fraud laws, and allegations of "transactions which constitute no more than internal corporate mismanagement." 430 U.S. at 479, 97 S.Ct. at 1304.

Construing *Santa Fe,* the United States Court of Appeals for the Third Circuit has warned that "we must be alert to ensure that the purpose of *Santa Fe* is not undermined by 'artful legal draftsmanship;' claims essentially grounded on corporate mismanagement are not cognizable under federal law." *Craftmatic,* 890 F.2d at 638–39. It would contravene the holdings of *Santa Fe* and *Craftmatic* to allow plaintiffs to convert allegations of mismanagement into a fraud claim simply by inserting the words "defendants failed to disclose that ..." before the claimed mismanagement. "The 'crucial difference' is whether there was misrepresentation or omission in the flow of material information.... Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." *Id.* at 639–40.

Defendants argue that this lawsuit is an example "of what has become an epidemic of lawsuits against banks and financial institutions as a result of the downturn currently afflicting banking, real estate, and the economy as a whole." Defendants' Brief at 1. They submit that the majority of courts considering similar lawsuits against financial institutions arising out of this downturn have dismissed them for lack of specificity in pleading fraud. While plaintiffs point to two district court opinions denying motions to dismiss similar to the instant motion (*Zinberg v. Washington*

*Bancorp,* Civ. No. 88–5194 (D.N.J. April 24, 1989); *In re Midlantic Shareholder Litigation,* 758 F.Supp. 226 (D.N.J.1990)), it appears that the weight of better reasoned authority lies in favor of dismissal on the facts in this case. *See, e.g., Gollomp v. MNC Fin., Inc.,* 756 F.Supp. 228 (D.Md. 1991); *Abrahamson v. Western Savings & Loan Assoc.,* Civ. No. 88–1677, 1989 WL 259994 (D.Ariz. July 3, 1989); *Salit v. Centerbank,* 767 F.Supp. 429 (D.Conn.1990); *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11 (D.Mass.1990); *Dubowski v. Dominion Bankshares Corp.,* 763 F.Supp. 169 (W.D.Va.1991); *Wilkes v. Heritage Bancorp.,* 767 F.Supp. 1166 (D.Mass.1991); *Driscoll v. Landmark Bank for Savings,* 758 F.Supp. 48 (D.Mass.1991); *Haft v. Eastland Fin. Corp.,* 755 F.Supp. 1123 (D.R.I.1991).

Because we find that plaintiffs have not pled sufficient facts to make out a viable primary claim for securities fraud, we must also dismiss the related aiding and abetting, control person, and conspiracy claims. In addition, this Court will decline to exercise its discretion to entertain the pendent state law claim for negligent misrepresentation. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

*Amendment of Complaint*

Plaintiffs request that in the event the complaint is dismissed, plaintiffs be granted leave to file an amended complaint curing any defects. Defendants argue that granting such leave would be inappropriate because plaintiffs have already filed one amended complaint. Defendants also argue that an attempt to amend the complaint would be futile since plaintiffs have admitted in discovery that they know of no facts suggesting that defendants committed fraud.

Since the prior amendment was made for the purpose of merging the allegations of several complaints that had been consolidated, and was filed before the motions to dismiss, plaintiffs will be granted leave to amend the complaint in a manner consistent with this Opinion. That is, plaintiffs must include facts sufficient to show that the financial losses complained of were the result of fraud.