**Matthew J. BERLINER, Plaintiff,**

v.

**LOTUS DEVELOPMENT CORP., et al., Defendants.**

**Gordon S. OPPENHEIMER, Plaintiff,**

v.

**LOTUS DEVELOPMENT CORP., et al., Defendants.**

**Donald B. GOODMAN, Plaintiff,**

v.

**LOTUS DEVELOPMENT CORP., et al., Defendants.**

**Civ. A. Nos. 88–2318–T, 88–2538–T and 88–2579–T.**

United States District Court, D. Massachusetts.

Feb. 5, 1992.

Glen Devalerio, Berman, Devalerio & Pease, Boston, Mass., Bashian & Halebian, New York City, Schiffrin & Craig, Chicago, Ill., Abbey & Ellis, New York City, for plaintiffs.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., Henry B. Gutman, Kerry L. Konrad, Karen F. Conway, Christopher Paik, Deborah K. Sorell, J. Douglas Richards, New York City, for defendants.

## MEMORANDUM

TAURO, Chief Judge.

The plaintiffs in these related cases are three individuals, Matthew J. Berliner, Gordon S. Oppenheimer, and Donald B. Goodman, who purchased shares of the defendant Lotus Development Corporation ("Lotus") at an allegedly artificially inflated price. They sue on behalf of themselves and an, as-yet, uncertified class of those who purchased Lotus shares between February 25, 1988 and October 7, 1988 (the "class period"). The plaintiffs claim that Lotus made material misrepresentations and omissions in violation of § 10(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, and the common law. Four Lotus directors, Jim P. Manzi, Alexander V. D'Arbeloff, Chester A. Siuda, and Aldo Papone, are also defendants. They are alleged to have been aiders and abettors of Lotus's fraud, and "control persons" under § 20 of the Act. 15 U.S.C. § 78t.

Lotus's alleged fraud, as chronicled in the Amended Class Action Complaint ("complaint" or "compl."), relates to "1–2–3 Release 3.0" ("release" or "Release 3.0"), an upgrade of Lotus 1–2–3, Lotus's software program. According to the complaint, the public eagerly awaited this release, as it was proposed to respond to competitive programs that had been challenging Lotus's dominance of the spreadsheet-program market. On several occasions during the class period, Lotus publicly announced both a date for the release and attendant financial projections. The gravamen of the complaint is that the defendants engaged in a "continuous course of conduct and conspiracy to knowingly or recklessly disseminate false and misleading information and to conceal and omit to disclose adverse material information about the delayed availability of Release 3.0 and its negative impact upon [Lotus's earnings]." Compl. ¶ 79.

The defendants have moved to dismiss the complaint, for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and failure to plead fraud with the particularity that Fed. R.Civ.P. 9(b) requires.

### A.

■ In order for the complaint to state an action under Rule 10b–5, it must allege facts that, if proved, would establish that Lotus made a material misrepresentation or omitted to disclose a material fact which it had a duty to disclose. *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 24, 28 (1st Cir.1987). Plaintiffs' theory is predicated on the falsehood of each of Lotus's announcements of a projected date for the release. These announcements will, therefore, be analyzed in turn. *See, e.g., Capri Optics Profit Sharing v. Digital Equip.*, 950 F.2d 5 (1st Cir.1991); *Backman v. Polaroid Corp.*, 910 F.2d 10, 15–18 (1st Cir. 1990) (*en banc*).

■ On February 25, 1988, Lotus announced that Release 3.0 would be available "late" in the second quarter of 1988 (as opposed to "in the second quarter of 1988"). Compl. ¶¶ 37, 46. The complaint identifies no facts or circumstances that

suggest that this projection was false when made. *See Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991) (affirming dismissal of complaint containing no factual allegations that would support a reasonable inference that defendants deliberately or recklessly disregarded known adverse circumstances at time of alleged misrepresentations). Rather, the plaintiffs apparently infer such falsity from Lotus's announcement, one month later, that the release would not be available until the fourth quarter of 1988. Compl. ¶ 53. Their inference, however, amounts to a charge of "fraud by hindsight," which is insufficient for purposes of stating a claim under the securities laws. The plaintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978); *In re Ramada Inns Sec. Litig.*, 550 F.Supp. 1127, 1132 (D.Del.1982) (typical "fraud-by-hindsight" suit alleges that information concerning impending misfortune or its root causes was omitted from earlier management publications despite fact that management then knew information). Especially where, as here, a product is understood to be in development, plaintiffs may not assert merely that, because the product did not come out when projected, plans for an earlier release were false. *Cf. In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) (recognizing difference between defendant's knowing that product may run into snags and knowing it has already developed problems so significant as to require months of delay).

On March 18, 1988, Lotus announced that Charles Digate, senior vice president of software development, had resigned because of conflicts with other senior executives, and that it had not yet changed its plans for introduction of Release 3.0. Compl. ¶ 52. Plaintiffs, again, do not allege any fact that suggests that, on March 18, Lotus had (or should have) *already* changed its plans for introduction of the release. Lotus's alleged use of the word "yet" anticipates, rather than forecloses,

the possibility that it *would* change its plans.

Four days later, Lotus announced that the release would in fact be delayed until the fourth quarter of 1988. Compl. ¶ 53. This announcement does not contradict the statement of March 18. Nor do plaintiffs allege any facts that show why this projected release date, which was repeated six times during the class period, was repeatedly false.[1] Again, the complaint relies on a later disclosure—one almost seven months later—to belie a former. On October 7, 1988, Lotus announced that the release would not be available until the second quarter of 1989. Compl. ¶ 69. This is yet another hindsight allegation of fraud.

Plaintiffs attempt to substantiate their claim of securities laws violations by pointing to three "circumstances" allegedly probative of the falsehood of the projected release date. First, they allege that five Lotus vice presidents resigned during the relevant period, thus evidencing the havoc that attended the development of the software, and the falsity or recklessness with which projections of its release were made.

The following departures are specified: On March 18, 1988, Charles Digate, senior vice president of software development, resigned. On April 20, and during the following weeks, Michael Kolowich, Palmer True, and Donald McLagen resigned. On August 9, Irfan Salim, general manager of the personal computer spreadsheet division, resigned. Compl. ¶¶ 52, 61, 63. As discussed above, Lotus announced that Digate had resigned because of conflicts with other senior executives. Four days later, it did announce a delay in shipping the release. If there were a connection between the resignation of Digate and a delay of Release 3.0, it was disclosed.

As for the next three resignations, plaintiffs' claim is undeveloped. In *Romani*, the court rejected as an allegation of fraud that the resignation of a general managing partner was an undisclosed loss to the partnership: "The complaint fails to specify any connection between [his] role and the partnership's ability to reach its profitability goals, and there is no reference to how his departure related to [the partnership's] disappointing performance." 929 F.2d at 879. Here, plaintiffs allege no facts that would link these vice presidents to the delay in producing Release 3.0, on which, notably, thirty-five developers worked. Compl. ¶ 77.

As for the resignation of Salim, Lotus announced that he left for personal reasons, and that his departure did not reflect operational problems. Compl. ¶ 63. No facts are alleged to show that this was false. A conclusory allegation, without supporting facts, is insufficient to support a claim of fraud. *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir.1985) (Rule 9(b) proscribes conclusory allegations of fraud). This court has previously dismissed as an inadequate allegation of fraud that the departure of seventeen employees evidenced a bank's deficient monitoring of its lending procedures. *Wilkes v. Heritage Bancorp, Inc.*, 767 F.Supp. 1166, 1174 (D.Mass.1991).

Second, plaintiffs allege that Lotus did not begin "beta testing" (sending out a version to test sites) until February 1989. Compl. ¶ 73. In a memorandum, plaintiffs urge the court to infer from this fact that, because such testing is a prerequisite to the commercial distribution of software, the defendants were at least reckless in announcing release dates when they did. Pls.' Resp. to Defs.' Supplemental Mem. in Supp. of Mot. to Dismiss at 3–4. Plaintiffs do not, however, allege any fact with respect to beta testing—such as the amount of time necessary to complete it—that would give rise to a reasonable inference that the repeated projections of a release in the fourth quarter of 1988 were false or reckless when made. The court refuses, borrowing the vivid language of the court in *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988), to "conjure up unpled allegations or contrive elaborately arcane scripts in order to carry the blushing bride through the portal."

To demonstrate: When Lotus announced, on August 24, that it was "aiming" to ship

---

1. On March 29, July 18, August 9, 12, and 24, 1988, and in the 1987 Annual Report (no date), Lotus represented that Release 3.0 would be available "in" or "late" in the fourth quarter of 1988. Compl. ¶¶ 58, 62, 63, 64, 65.

Release 3.0 "late" in the fourth quarter, compl. ¶ 65, four months remained in the year. "Aiming," of course, denotes a measure of uncertainty. No facts are alleged to support a contention that four months were so insufficient for beta testing that Lotus must have been lying or reckless when it announced, in August, an end-of-the-year release. Without any illustrative facts, the naked allegation that beta testing did not begin until February 1989 discloses no circumstance that might separate fraud from the benefit of hindsight. *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

Rather than evidence the claim that Lotus fraudulently misrepresented the upgrade's release, the allegation of tardy beta testing suggests, possibly, that Lotus's development policies were inadequate to the task. Indeed, the sole factual support that plaintiffs provide with regard to beta testing procedures is director Manzi's subsequent recognition, in Lotus's 1988 Annual Report, that, because of "development problems" with Release 3.0, Lotus had implemented a "policy now of not talking about products until they're well into the beta test cycle." Compl. ¶ 76. This statement does not indicate that Lotus had made misrepresentations in the past. Perhaps it infers that the scheduling of beta testing is a matter of policy. But, as this court has recognized, federal securities laws do not concern themselves with such managerial decisions. *See, e.g., Konstantinakos v. Federal Deposit Ins. Corp.*, 719 F.Supp. 35, 39 n. 7 (D.Mass.1989).

As a third and final circumstance indicative of fraud, plaintiffs allege that Lotus had an incentive to defraud the public, as had certain employees who sold Lotus shares. Lotus, by announcing Release 3.0, purportedly wished to dissuade customers from purchasing other products. Compl. ¶¶ 42–43. But showing that Lotus and the alleged insider traders had a motive for fraud is not a substitute for showing that fraud was actually committed. *See Wayne Inv., Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 14 (1st Cir.1984). The insider sales, in February (before the class period), March, and May—which are not alleged to have violated insider-trading proscriptions—are not, by themselves, a sufficient basis for inferring that Lotus, between February 25 and October 7, repeatedly misrepresented the date of Release 3.0.[2]

**B.**

■ The claim that Lotus misrepresented its projected earnings is based on two announcements. On March 23, Lotus represented to analysts that its revenues and earnings would not materially decline because of the delay it had announced the day before. Compl. ¶ 54. And on April 6, director Manzi said, in an interview, that income estimates were still "reasonable." Compl. ¶ 59. Soon after, Lotus reported financial results for the first quarter, which showed that income did in fact rise 34% from the previous year. Compl. ¶ 60. Second quarter earnings, announced in July, were 6% ahead of earnings for the same period the year before. Compl. ¶ 62. These returns negate plaintiffs' assertion that Lotus knew, three and four months earlier, that its earnings would later fall. *See Romani*, 929 F.2d at 879.[3]

**C.**

■ The allegations against the individual defendants are premised on the same alleged fraud with which Lotus is charged. The insufficiency, therefore, of the allegations against Lotus requires dismissal of

---

2. In the month preceding Lotus's February 25 announcement of a delay—thus before the first alleged misstatement—Manzi, D'Arbeloff, and a non-party officer, Charles Digate, sold Lotus shares; and in the week preceding the March 22 announcement of a delay, another officer sold shares. Compl. ¶¶ 49–51, Ex. A.

On May 2, 3, and 17, officers Stephen J. Crummey and Harry Andersen sold shares. Compl. Ex. A.

3. On July 18, Lotus stated further that it expected that third quarter sales could be materially affected by the delay of the release, compl. ¶ 62, a statement indicative not of fraud, but of probity. *See Wilkes*, 767 F.Supp. at 1175 (finding pleading of fraud insufficient with respect to bank's statements that disclosed loss and predicted continued deterioration of assets).

the aider/abettor and control person claims against the individuals. *See Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir. 1983) (aider/abettor liability requires violation of 10b–5 by primary party); *Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1133–34 (D.R.I.1991) (dismissing control person allegation upon dismissal of 10b–5 allegation).

### D.

As for the negligent misrepresentation claim, plaintiffs did not plead either privity between the parties or that the defendants knew of the plaintiffs' reliance. That claim, accordingly, must be dismissed. *Hurley v. Federal Deposit Ins. Corp.*, 719 F.Supp. 27, 34 (D.Mass.1989).

The court, finally, declines jurisdiction over the remaining claim, common-law fraud. *See Loan v. Federal Deposit Ins. Corp.*, 717 F.Supp. 964, 969 (D.Mass.1989) (respect for state legal system favors dismissal of remaining state count after federal claims dismissed).

An order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum, Defendants' Motions to Dismiss the Amended Class Action Complaints in these cases are hereby ALLOWED.