Lawrence S. BOROW and Kenneth Borow, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

nVIEW CORPORATION, James H. Vogeley and William M. Donaldson, Defendants.

Fergal K. GARTLAN, on behalf of himself and all others similarly situated, Plaintiff,

v.

nVIEW CORPORATION, James H. Vogeley and William M. Donaldson, Defendants.

Civ. A. Nos. 4:92CV105, 4:93CV18.

United States District Court, E.D. Virginia, Newport News Division.

Aug. 12, 1993.

David N. Montague, Montague, Saunders and Desaulniers, Hampton, VA, Bruce K. Cohen, Robert M. Wolff, Philadelphia, PA, Martin E. Grossman, Bala Cynwyd, PA, for Lawrence S. and Kenneth Borow.

Hunter Wilmer Sims, Jr., Kaufman & Canoles, Norfolk, VA, for nView Corp., James H. Vogeley and William M. Donaldson.

Stewart J. Sacks, Annemarie Dinardo Cleary, Faggert & Frieden, P.C., Chesapeake, VA, for Fergal K. Gartlan.

Cecelia Ann Weschler, Weinberg & Stein, Norfolk, VA, for McKinnon & Co., Inc.

## OPINION AND ORDER

DOUMAR, District Judge.

Plaintiffs, Lawrence S. Borow, Kenneth Borow, and Fergal K. Gartlan, on behalf of themselves and all others similarly situated,[1] brought this action against defendants, nVIEW Corporation, James H. Vogeley, and William M. Donaldson, pursuant to Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission ("SEC").[2] By order dated April 7, 1993, this Court found that plaintiffs had failed in their initial complaint to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, the Court dismissed the complaint but granted plaintiffs leave to amend their complaint to meet the requirements of Rule 9(b). On April 22, 1993, plaintiffs filed a sixty-six page amended complaint in which, at the Court's direction, they specified the particular statements made by defendants that they challenged as false and misleading.

Presently before the Court is defendants' motion to dismiss the amended, consolidated class action complaint for failure to plead facts allegedly constituting fraud with the requisite particularity and to state a claim upon which relief may be granted, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons stated below, the Court GRANTS defendants' motion and DISMISSES the complaint.

### I.

Plaintiffs, Lawrence S. Borow, Kenneth Borow, and Fergal K. Gartlan, assert that they purchased shares of nVIEW common stock on the open market between December 8, 1991, and July 30, 1992. When the price of the shares declined, they brought this action, alleging fraudulent misrepresentation and material omissions.

Defendant nVIEW Corporation is a Virginia corporation in the business of incorporating flat panel liquid crystal display ("LCD") technology into products capable of projecting high quality images from personal computers, videocassette recorders, laser disc players, television receivers, and video cameras on standard overhead projectors or in proprietary self-contained projectors. The individual defendants, James H. Vogeley and William H. Donaldson, are officers of nVIEW.

Defendant Vogeley is a co-founder of the company and has been Chairman of the Board since nVIEW's incorporation in 1987. Until June 9, 1992, Vogeley was the company's Chief Executive Officer, and he served as President until March, 1991. Currently, Vogeley acts as Chairman of the Board and Chief Scientist. Defendant William H. Donaldson is the company's President and Chief Executive Officer. Donaldson has served as the company's Chief Financial Officer and has been a Director since 1991. Until 1991, he was Vice President and Chief Operating Officer.

Initially, the company was a great success. As it began to expand, the company anticipated that it would be able to build upon its

---

1. Plaintiffs purportedly have alleged a class action suit. In light of the result reached in this opinion, however, the Court need not decide whether certification of a class would be appropriate in this matter. The Court does not, by this opinion, indicate that a class action would or would not be certified.

2. Plaintiffs' initial complaint also alleged claims of common law fraud and negligent misrepresentation. By order of April 7, 1993, this Court dismissed those claims.

prior history with equally positive results. Those hopes did not materialize as anticipated. However, the company remains a viable, productive operation and its securities continue to be traded on NASDAQ.

In its Opinion and Order of April 7, 1993, this Court dismissed plaintiffs' initial complaint, finding that they had not pled the "who, what, when, where, and how" required by Rule 9(b). Opinion and Order, Civil Action No. 4:92cv105, at 4 (E.D.Va. April 7, 1993) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)). The Court now confronts identical issues with regard to plaintiffs' lengthy amended complaint, in which plaintiffs have enumerated for the Court the specific statements that they challenge in this action.

In their amended complaint, plaintiffs allege that defendants

> conditioned the market with statements concerning (1) nVIEW's stellar and rapid prior growth in sales and earnings, (2) the exploding growth in the projection display market, (3) the vastly larger multi-media market which was being addressed by nVIEW's newest products and (4) nView's technological leadership and competitive advantage....

Plaintiffs further maintain that defendants had stressed the importance of new products and the increased availability of component parts for nVIEW's future. Against this background, plaintiffs allege, defendants "embarked upon a course of conduct misrepresenting the outlook for nVIEW's future performance." [3]

Plaintiffs claim that—in reliance on the integrity of the market, which allegedly had assimilated and responded to the challenged statements—they purchased nVIEW's common stock at artificially inflated prices. Plaintiffs assert that defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of fraudulent conduct ... in an effort to assure investors of the integrity and accuracy of nVIEW's public announcements regarding its operations, finances and the prospects of future earnings, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about nVIEW and its business, in the light of the circumstances under which they were made, not misleading. This conduct operated as a fraud and deceit upon the purchasers of nVIEW stock during the Class Period, and a fraud on the market for nVIEW common stock.

In support of this broad allegation, plaintiffs quote numerous, specific statements from a variety of sources, alleging that those statements were false or misleading within the meaning of Rule 10b–5. Plaintiffs cite various statements made by defendants in nVIEW Corporation's Preliminary Prospectus of December 17, 1991; in nVIEW's Final Prospectus of January 23, 1992; [4] in a February 3, 1992, Press Release, which was reported by the Bloomberg Business News Service on February 5, 1992; in an interview of defendant Donaldson, which was reported by the Bloomberg Business News Service on February 27, 1992; in nVIEW's Form 10–K filed with the SEC, dated March 24, 1992; in an April 22, 1992, News Release; in nVIEW's Form 10–Q, dated May 14, 1992; and in News Releases dated May 28, 1992, and July 24, 1992.

At the hearing on the initial defective complaint, the Court requested from the bench that the plaintiffs set forth the full text of the documents quoted, and, in particular, the prospectus. However, the plaintiffs have

---

**3.** Throughout the complaint, plaintiffs claim that "defendants," collectively, made the allegedly fraudulent statements; with few exceptions, they do not attribute the challenged statements to a specific defendant.

**4.** In their complaint, plaintiffs quote from the Preliminary Prospectus certain statements that they allege are false and misleading. In paragraph 66 of the complaint, plaintiffs state that "[i]n all material respects [the Final] Prospectus was identical to the Preliminary Prospectus. Thus, the misrepresentations and omissions previously identified in the Preliminary Prospectus were repeated by defendants upon the issuance of the Final Prospectus on January 23, 1992."

chosen not to set forth the entire prospectus. Since what they have chosen to allege is sufficient for a ruling, it is not necessary to have the full prospectus, with its risk factors enumerated or the full context of the allegedly fraudulent statements, in order to resolve this matter.

## II.

■ At the outset, it is important to note that this suit is not only against individuals, but also against the corporation,[5] and, thus, against the shareholders themselves. In other words, all the shareholders will ultimately bear much, if not all, of the cost of litigation. Under these circumstances, the Court must be particularly careful to analyze broad allegations of fraud in light of the effects of proceeding on all of the shareholders. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742–43, 95 S.Ct. 1917, 1928–29, 44 L.Ed.2d 539 (1975) ("in this type of litigation, where the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, ... but because of the threat of extensive discovery and disruption of normal business activities which may accompany a lawsuit which is groundless in any event."). Thus, the purpose of the litigation must be to right wrongs and not an end unto itself.

■ To state an action under Rule 10b–5,[6] plaintiffs must allege facts that, if proved, would establish that defendants, with scienter, made a material representation or omitted to disclose a material fact that they had a duty to disclose. The circumstances of this case are remarkably similar to those in *Kowal v. MCI Communications Corp.*, 1992 WL 121378, 1992 U.S.Dist. LEXIS 7437 (D.D.C. 1992), in which the court stated:

This case presents the paradigm of a recurring, vexing problem under the federal securities laws: A company enjoys considerable success and its officers disseminate optimistic reports predicting that the company's success will continue. Subsequently, however, the company's economic position worsens, and the optimistic projections fail to materialize. Upset investors reexamine the company's financial situation at the time the optimistic reports were made, decide that for various reasons the company's optimism was unfounded, and bring suit to recover their losses on a theory of securities fraud. The question the courts must then decide, and the question squarely confronting the Court here, is whether the plaintiff has alleged, in addition to the fact of unfulfilled projections sufficient indicia of fraud to state a claim under Rule 10b–5 and justify the enormous expense and burden of discovery and trial of a large securities fraud action.

*Id.* [1992 WL 121378 at *3] at *10. Where, as is in the case before us, most of the statements complained of represent projections or expressions of optimism that did not come to fruition, plaintiffs must allege more than the failure to meet the projections. Plaintiff must demonstrate that the implicit factual assertions underlying the beliefs or projections were so inaccurate as to constitute fraud. When a company or its officers make projections about the company's future, the implicit assertions are that (1) the statement is genuinely believed; (2) there is a reasonable basis for that belief; and (3) the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the belief. *In re Apple Computer Secur. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied, Schneider v. Apple Computer,*

---

5. See footnote 3. The allegations continually refer to actions of the "defendants" in plural.

6. Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

*Inc.*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

Hence, to survive a Rule 9(b) motion, plaintiffs must point in the complaint to some reason that the difference between the rosy projections and later results is attributable to fraud. *See DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Dubowski v. Dominion Bankshares Corp.,* 763 F.Supp. 169 (W.D.Va.1991) (though plaintiffs do not have to plead their evidence, they must do more than contrast quarterly and yearly statements presented over a two-year period).[7] Because only a fraction of financial deteriorations are the result of fraud, plaintiffs must allege facts indicating that the change in circumstances resulted from defendants' fraudulent scheme. *DiLeo,* 901 F.2d at 627; *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978); *Dubowski,* 763 F.Supp. at 172; *In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1453 (N.D.Ill.1991) ("Although lengthy quotations from statements of the defendants may provide quite specific information as to time, place, content, and speaker, such technical compliance does not satisfy rule 9(b)'s edict in the securities fraud context.... rule 9(b) requires that the complaint set forth the facts on which the belief is founded ...") *amended complaint dismissed In re First Chicago Corp. Secur. Lit.,* 789 F.Supp. 919 (N.D.Ill.1992). Mere allegations of fraud by hindsight will not withstand a Rule 9(b) motion. *Denny,* 576 F.2d at 470; *see also Berliner v. Lotus Dev. Corp.,* 783 F.Supp. 708 (D.Mass.1992) (charge of "fraud by hindsight" is insufficient for purposes of stating a claim under securities laws; "Shareholders may not simply seize upon disclosures made later and allege they should have been made earlier."); *Gollomp v. MNC*

*Financial Inc.,* 756 F.Supp. 228 (D.Md.1991) (plaintiff must plead sufficient facts to support conclusory allegations). The test outlined in *Apple Computer* helps flesh out the pleading requirements in this case. In order to attack projections or beliefs about the company's future, the plaintiff must plead facts that tend to show that, at the time they were made, the statements either weren't genuinely believed or that there were no reasonable grounds for the belief, or that the proponent knew facts that seriously undermined the grounds for the belief.

Plaintiffs' theory that defendants "employed devices, schemes, and artifices to defraud" is predicated on certain categories of statements by the defendants. Specifically, plaintiffs' allegations concern defendants' statements regarding (1) new products; (2) availability of LCD panels and unusually large shipments at the end of the first quarter of 1992; (3) future earnings projections and price cuts; and (4) operating expenses. The Court will analyze in turn each category of allegedly fraudulent statements to determine whether plaintiffs have alleged sufficient indicia of fraud to survive defendants' Rule 9(b) motion.

### 1. New Products

Plaintiffs allege that defendants identified two new products, nSIGHT and nLIGHTEN (also known as the color ViewDesk and the Luminator), as integral to extensive future sales growth. Plaintiffs recite in great detail, a series of announcements and subsequent revisions regarding these products. Plaintiffs never complain about the products

---

**7.** Plaintiffs would like to rely on a recent 4th Circuit decision, *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256 (4th Cir.1993), for the proposition that broad, open-ended projections of performance should be sufficient to permit a case to go to trial. This case is inapposite.

The defendants in *Cooke* asserted only that the market was sufficiently apprised—by *third parties*—of its failing condition and that, therefore, no fraud on the market had occurred. The Court held that until a certain date the "total mix of information" was sufficiently confused to give rise to a variety of interpretations as to whether the defendants' statements had misled the market.

The question before us in the instant case is not whether the statements misled the market, or whether third party information was sufficient to overcome the effect of the company's own statements. Rather, the issue before this Court is whether the company's statements are actionable in the first place. As discussed at length below, plaintiffs have failed to allege sufficient facts to show that any materially misleading statements or omissions were made. Instead, they have relied on 20/20 hindsight to insinuate that later shortcomings amounted to earlier fraud. Therefore, the "total mix of information" available to the market is not at issue and *Cooke* does not inform our decision in any way.

themselves,[8] but consistently assert that defendants' revisions of the delivery date of the product amounted to material misstatements. In sum, these projections are as follows.

In their preliminary prospectus dated December 17, 1991, defendants indicated that they hoped to have nSIGHT on the market by January and nLIGHTEN on the market sometime thereafter. In a February press release, nVIEW revised the delivery dates to the first quarter for nSIGHT and the second quarter for nLIGHTEN. Donaldson reiterated the second quarter projection in an interview later that month. In April, defendants issued a press release announcing the first quarter results. Without specifying any date, the press release noted "We expect to begin delivery of two of our latest products [nSIGHT and nLIGHTen]." On May 28, 1992, a press release revised the delivery date to late spring or early summer for nSIGHT, and explained that the delay was due to "a delay in the Beta testing phase of product development." The press release also explained that the nLIGHTEN, "previously expected this quarter is now expected to be available for shipment in limited quantities with full production ramping up in the third quarter."

At every stage of these developments, plaintiffs assert that the statements were false and misleading because "defendants knew (or but for their reckless disregard of the facts should have known) that testing had not been completed for the nSIGHT." Plaintiffs maintain that defendants lacked a reasonable, good faith basis for their statement in the Preliminary Prospectus that shipment would begin in January, 1992, because defendants must have known that testing of nSIGHT had not yet been completed successfully. Plaintiffs renew this assertion with respect to each of the subsequent statements of delivery dates. With regards to the May press release, although defendants truthfully indicated in this news release that the Company had experienced some testing problems associated with nSIGHT and nLIGHTEN, plaintiffs contend that defen-

dants should have announced these problems earlier. Plaintiffs assert that defendants' failure to do so constituted a material omission, making their prior statements false and misleading.

"Especially where, as here, a product is understood to be in development, plaintiff may not assert merely that, because the project did not come out when projected, plans for an earlier release were false." *Berliner,* 783 F.Supp. at 710; *cf. Apple Computer,* 886 F.2d at 1115 ("There is a difference between knowing that any product-in-development may run into a few snags and knowing that a particular product has already developed problems significant as to require months of delay.") In *Berliner,* the court found that plaintiffs had not alleged "any fact with respect to beta testing—such as the amount of time necessary to complete it—that would give rise to a reasonable inference that the repeated projections of a release in the fourth quarter of 1988 were false or reckless when made." *Berliner,* 783 F.Supp. at 711. Such is the case here, as well.

On December 17, 1991, in nVIEW's Preliminary Prospectus, defendants stated that nSIGHT was scheduled to being shipping in January. Three days after the end of January, on February 3, 1992, defendants stated that nSIGHT would begin shipping in the first quarter. Plaintiffs identify no facts or circumstances that suggest this projection was false when made. Plaintiffs infer the falsity of this projection from defendants' update on February 3, 1992, that shipping would not begin until the second quarter. Plaintiffs conclude that, because defendants later informed the market that they had encountered testing problems with nSIGHT, defendants must have known in December and January that their product would encounter testing problems.

Thus, with regard to nSIGHT, plaintiffs make their allegations with the benefit of hindsight. Knowing now that nSIGHT ultimately was shipped later in 1992 than originally forecast, and knowing now—through defendants' public statements and disclo-

---

8. Nor do plaintiffs mention the company's several other successful products that were already on the market or were proposed which were discussed in the preliminary and final prospectus. The plaintiffs also assiduously avoided any mention of the risk factors set forth in the prospectus.

sures—that nSIGHT at some point encountered testing problems, plaintiffs have concluded that defendants knew of these testing problems as early as December, 1991. According to plaintiffs, because defendants later announced that testing problems had occurred, they must have known of these testing problems in December, 1991, and, therefore, defendants' statements in the Preliminary Prospectus must have been intentionally false and misleading.

■ Plaintiffs' conclusory allegations regarding the delays in testing for nSIGHT, lacking supporting facts, are tantamount to fraud by hindsight, which is insufficient to state a claim under Rule 10b–5. *DiLeo*, 901 F.2d at 627; *Denny*, 576 F.2d at 470; *Dubowski*, 763 F.Supp. at 172; *Berliner*, 783 F.Supp. at 712. Plaintiffs fail to allege facts that show that the statements were unfounded at the time they were made under the *Apple Computer* test. 886 F.2d 1109.

■ Furthermore, the Court finds that plaintiffs have alleged no false or misleading statements by defendants with regard to the new product, nLIGHTEN. Plaintiffs have alleged no fact that links the production of NLIGHTEN to the testing and shipping schedule for NSIGHT. Plaintiffs merely have quoted statements by defendants that amount to "puffery"; such statements lack the materiality essential to a securities fraud claim. *See Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir.1992).

Accordingly, the Court finds that plaintiffs' allegations regarding the new products, nSIGHT and nLIGHTEN, do not state a claim of fraud sufficient to withstand defendants' Rule 9(b) motion.

### 2. *Panel Availability and End of First Quarter 1992 Shipments*

Plaintiffs quote from the Preliminary Prospectus statements regarding the future supply of LCD panels and nVIEW's sales: [9]

Management believes the company could have had significantly higher sales if it would have received a larger supply of TFT AMLCD panels and that its supply of TFT AMLCD will improve significantly in early 1992.

Complaint ¶ 61 (quoting Preliminary Prospectus at 3).

Management believes that the commercial availability of TFT panels will dramatically change the makeup of the projection display industry. Due to its technological expertise, management feels that nVIEW is uniquely positioned to capitalize on this development.

Complaint ¶ 61 (quoting Preliminary Prospectus at 5).

*Outlook.* Management believes that TFT AMLCD availability will improve substantially in 1992. Accordingly the Company's ability to fill orders for its TFT AMLCD products should improve as they receive more panels. This is expected to result in a higher volume of sales.

Complaint ¶ 61 (quoting Preliminary Prospectus at 20).

Plaintiffs allege that these statements misled the market "to believe that nVIEW's sales and earnings would increase at the rates experienced in 1991, particularly the third quarter of 1991, or at even greater rates directly as a result of the increased availability of LCD panels." Complaint ¶ 62. Plaintiffs further allege:

Defendants lacked a reasonable and good faith basis for their statements concerning nVIEW's outlook as a result of greater panel availability because they knew or recklessly disregarded that the testing problems with nSIGHT and nLIGHTEN, and the resulting delays in the introduction of these new products, would overshadow the significance of greater panel availability to the Company's performance.

Complaint ¶ 64.

Plaintiffs allegations, therefore, amount to a repetition of the claim that defendants'

---

9. The Court notes that the Preliminary Prospectus contained a lengthy section entitled "Risk Factors", which plaintiffs completely ignore in their complaint. In that section, defendants issued numerous statements qualifying their optimistic future outlook. *Inter alia*, this section of the prospectus listed as risk factors: component availability and cost; limited operating history and potential fluctuations and quarterly results; new products; cash flow needs; new products and technological change; competition; international sales; and possible volatility of stock price.

statements in the Preliminary Prospectus were false in light of the testing problems associated with nSIGHT and nLIGHTEN. The Court finds these allegations insufficient for the reasons stated above in Part II.1. Further, plaintiffs have provided no facts supporting their claim that delays in the production of nSIGHT and nLIGHTEN "would overshadow the significance of greater panel availability to the Company's performance."

Plaintiffs next quote the following statements, attributed to defendant Donaldson, which were contained in the April 22, 1992, News Release:

> "Increased demand for our expanding line of award winning liquid crystal display (LCD) projection products, coupled with increased availability of key components used in our proprietary color video projection panels, have boosted sales to record highs. While pleased with the increased availability of active matrix LCD's, approximately 62% of the LCD's delivered in the first quarter were received in the last six days of March. With the volume of LCD's received in March and the increased volume we are receiving on a monthly basis, the restrictions on revenue growth created by the non-availability of LCD's no longer exist."

Complaint ¶ 93 (quoting April 22, 1992, News Release). Plaintiffs compare the statements from the April 22, 1992, News Release with later statements from a May 28, 1992, press release. In a May 28 News Release quoted by plaintiffs, defendant Donaldson stated:

> [W]e shipped an unusually large number of finished products to distributors and dealers in the final weeks of the March quarter. This resulted in satisfying a large order backlog as well as restocking depleted inventories at all levels within the distribution channel.

From these two statements, plaintiffs conclude that defendants, in their April 22, 1992, announcement, "concealed the fact that they had 'stuffed future sales' into the first quarter to achieve the results they announced." Complaint ¶ 95. Plaintiffs assert that "Defendants 'stuffed' sales into the first quarter so as to create the appearance that they were at least close to meeting analysts' and the market's sales and earnings expectations." *Id.*

Because defendants made admittedly truthful statements on May 28, plaintiffs conclude, without providing any provable facts in support of their conclusion, that defendant must have known of the situation on April 22, a mere three weeks after the close of the first quarter. The Court finds plaintiffs' conclusions to be unsupported by allegations of provable fact and, therefore, deficient under Rule 9(b).

### 3. *Future Earnings Projections and Price Cuts*

With regard to defendants' statements concerning financial projections, plaintiffs allege:

> First, Donaldson said in an interview reported by the Bloomberg Business News Service that Finnie's forecast of lower 1992 earnings "is not worthy of comment." Defendant Donaldson also stated that he was comfortable with analysts, 1992 earnings estimates.... Donaldson made this statement after nVIEW announced price cuts on its AMLCD products.

Complaint ¶ 72. Plaintiffs assert that defendant Donaldson stated on February 27, 1992, that

> (1) nVIEW remained comfortable with analysts' estimates of nVIEW's 1992 earnings of between $1.12 and $1.25 per share, (2) he did not believe recent moves by nVIEW's competitors would slow the Company's expected earnings growth, (3) the competitive threats from nVIEW's competitors "are not new at all," (4) "We are very comfortable with the competition"....

Complaint ¶ 76. Plaintiffs claim that, in nVIEW's February 27, 1992, News Release, "Defendants made a particular point of rebutting Finnie's analysis to conceal their prior fraud." Plaintiffs characterize Donaldson as "playing down the fact" that the price cuts were in response to competition. Plaintiffs conclude that nVIEW's new sales had declined, leading to the price reductions of February 5, 1992.

Plaintiffs next challenge the following statements, which were contained in nVIEW's Form 10–K, dated March 24, 1992:

In March 1992, nVIEW began receiving substantially higher quantities of AMLCD panels (approximately three times the prior monthly volume). This greater volume of panels has yielded better pricing on this critical component. In addition, the Company has been actively engaged in programs to reduce the cost of its products using AMLCDs ever since their introduction. In an attempt to increase demand for its AMLCD products by making them attractive to a wider buying public and in response to recent competitive moves by its chief competitors, InFocus Systems and Sharp, the Company on February 5, 1992, reduced the list price on its entire line of AMLCD based products. nVIEW's management believes that this move clearly positions nVIEW as the dominant supplier of this technology, with the broadest line of products that carry comparable or better performance to all competitors, with greater features and availability, yielding the greatest value to dealers and end-users in the industry. Further, management believes that this move will not adversely affect gross margin percentages over the course of 1992 and in fact will lead to higher total gross margin dollars. This will further allow nVIEW to continue its aggressive positioning efforts in this exciting new market segment.

Complaint ¶ 83 (quoting Form 10–K dated March 24, 1992, at 17).

Plaintiffs complain that defendants "failed to update or change their earnings forecasts made in February 1992, until May 28, 1992." Complaint ¶ 104. Plaintiffs contend that defendants had a duty to update and change the earnings forecasts made by others (market analysts) of between $1.12 and $1.25 per share.

In their May 28, 1992, News Release, defendants stated that the company had adjusted its sales outlook for the second quarter to be below that reported for the first quarter. The news release also stated that the company had re-evaluated its sales and earnings for 1992 to reflect the current slowdown in de-

mand. Plaintiffs contend that, in the middle of the first quarter, defendants should have been able to project accurately second quarter sales. When defendants informed the market during the course of the second quarter that sales were lower than expected, plaintiffs conclude that defendants must have acted fraudulently in February, 1992.

On July 24, 1992, three weeks after the close of the second quarter, plaintiffs allege that defendants stated in a News Release:

Sales were particularly slow in the Company's international operations when, for the second quarter, sales declined 50% from the first quarter. Domestic sales, while below expectations, increased 22% for the second quarter over the previous quarter's results. Recent actions taken to expand the international distribution network, coupled with additions to our international sales and marketing activities, are expected to counter the effects of the slow down in international sales.

Complaint ¶ 107. In the July 24, 1992, News Release, Donaldson was quoted as saying:

As we stated in a May 28, 1992 news release, we believe sales in the first half of the second quarter were adversely affected by a lag in reorders from our dealer and distributor network brought about by a large, concentrated shipment of products into the network at the end of March.

Complaint ¶ 112.

Plaintiffs characterize this statement as "reveal[ing] the full extent of the sales collapse in the second quarter as a direct result of the unusually large first quarter shipments." Thus, plaintiffs contend that, although defendants truthfully reported on the second quarter results three weeks after the close of the second quarter, defendants should have provided this information earlier. Plaintiffs maintain that the failure to do so constituted a material omission:

Defendants knew or recklessly disregarded the fact that their decision to make the unusual shipments in the first quarter, at a time of declining sales, would have the adverse consequences on second quarter results announced on July 24, 1992. Their failure to reveal these shipments and their

consequences in their earlier statements was a material omission making them false and misleading. Complaint ¶ 112.

■ "[P]rojections and general expressions of optimism may be actionable under the federal securities laws." *Apple Computer*, 886 F.2d at 1113. However, "[o]ptimistic, vague projections of future success which prove to be ill founded are not, without more, sufficiently material to incur Rule 10b–5 liability. When, however, such projections are accompanied by either specific qualifications of projected results implying certainty (e.g., earnings shall increase at least 30% next year) or statements of fact which prove to be erroneous, then such statements can be the basis of Rule 10b–5 liability." *Colby v. Hologic, Inc.*, 817 F.Supp. 204 (D.Mass.1993).[10] Defendants had no duty to disclose "pejorative characterizations" of nVIEW's business prospects. *Kowal* [1992 WL 121378 at *4] at *14. "Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry. The focus of the securities laws is on the disclosure of facts; characterizations of or conclusions drawn from those facts are matters that are left to the judgment of investors." *Id.*

Plaintiffs characterize the statements in the April 22, 1992, press release as misleading, arguing that they led the market to believe that nVIEW's future performance would be better that its first quarter performance. In plaintiffs' view, nVIEW's performance resulted from declining demand and increasing competition, and they conclude that defendants with knowledge of this attempted to mislead the market into believing that it was actually the unavailability of panels that caused nVIEW's failure to meet the market's expectations in the first quarter of 1992. Plaintiffs' interpretation of defendants' April 22, 1992, statements, which defendants made a mere three weeks into the second quarter of 1992, amounts merely to allegations of fraud by hindsight. *DiLeo*, 901 F.2d at 627; *Denny*, 576 F.2d at 470; *Dubowski*, 763 F.Supp. at 172; *Berliner*, 783 F.Supp. at 712. Plaintiffs fail to allege facts

that show that the statements were unfounded at the time they were made under the *Apple Computer* test. 886 F.2d 1109.

Earnings forecasts originating with market analysts and not with defendants, are claimed to be fraud by the defendants since the defendants did not update the analysts' figures. Although defendants may have been optimistic about nVIEW's future—their optimism perhaps based in part on the company's prior history—defendants made no projections implying certainty of future results. Rather, any specific projections were made by third parties.

This Court shares the view of the *Kowal* court, which stated:

> To allow plaintiffs' allegations in this case to survive a motion to dismiss ... would concede the viability of Rule 10b–5 complaints in virtually every instance in which corporate officers have made optimistic predictions that failed to materialize. In every such case, disappointed investors will be able to recharacterize, as plaintiffs have here, the company's economic outlook at the time the forward-looking statements were made, and declare that the difference between plaintiff's retrospective characterization and the original prediction must be attributable to fraud, despite the fact that "only a fraction of financial deteriorations reflects fraud."

*Kowal*, [1992 WL 121378 at *7] at *22–23 (quoting *DiLeo*, 901 F.2d at 627). The Court finds that plaintiffs again have failed to state anything more than conclusory allegations with regard to defendants' alleged statements or non-statements concerning future earnings. No alleged facts tend to show that the statements were unfounded at the time they were made under the *Apple Computer* test. 886 F.2d 1109. Furthermore, many of the alleged statements were "soft," vague statements relayed to the market in a third party's interpretation of those statements. The Court finds these allegations insufficient to support a Rule 10b–5 claim.

#### 4. *Operating Expenses*

Plaintiffs challenge statements regarding operating expenses that were contained in

---

**10.** The Court, for the reasons stated above, again finds that *Cooke* is not on point here, even though

language taken out of the context of the opinion might appear appropriate.

nVIEW's March 24, 1992, Form 10–K. Plaintiffs assert:

> In the March 24, 1992 Form 10–K, defendants continued to promote nVIEW's declining operating expenses/sales ratio and stated that for 1991 sales were $16,791,000 and operating expenses were $3,991,000 and highlighted that, "Operating expenses, while increasing in amount, are decreasing as a percentage of sales. In 1991, operating expenses as a percentage of sales were 24% compared to 41% in 1990." Form 10–K dated March 24, 1992 at pp. 12–14.

Complaint ¶ 98. Plaintiffs allege that "as early as the December 17, 1991 Preliminary Prospectus, defendants promoted nVIEW with statements that operating expenses as a percentage of sales were declining." Complaint ¶ 98. Defendants stated in nVIEW's Form 10–Q for the first quarter of 1992, issued on May 14, 1992, that the ratio of operating expenses to sales had gone down from 29% in 1991 to 23% in 1992. Plaintiffs assert that "[i]n truth, nVIEW, in the face of falling demand, had established additional marketing and promotion programs and was spending relatively more money to obtain new sales, as opposed to satisfying backorders and filling distributor inventories." Complaint ¶ 99.

Again, with the benefit of hindsight, plaintiffs point to defendants' July 24, 1992, announcement as indicative of prior misleading statements:

> Operating expenses of $2.6 million for the second quarter were well above the $785 thousand for the second quarter of 1991 and the $1.7 million for the first quarter of 1992. Operating expenses increased for the second quarter primarily as a result of higher levels of marketing and promotion expenses associated with a significantly expanded product line and included costs related to the introduction of several new products at the end of the second quarter. For the same reason, research and development costs also exceeded prior period levels. General and administrative expenses, including personnel expenses, grew in response to a continuation of a program, initiated in the first quarter of 1992, to build a strong effective infrastructure to support future growth.

Complaint ¶ 109. With regard to the July 24, 1992, statements, plaintiffs allege:

> In this announcement, defendants revealed for the first time the program they initiated in the first quarter to build an additional infrastructure for nVIEW's products and the cost of this program. Having repeatedly told the market that nVIEW had already incurred the expenses to build an extensive marketing and distribution system, defendants were under a duty to reveal the existence of the new infrastructure program and its attendant cost promptly. Their failure to reveal the existence of this program until July 24, 1992 was a material omission making their earlier statements ... false and misleading. Moreover, defendants breached their duty to update and correct statements ... which had become false and misleading....

Complaint ¶ 110. Thus, plaintiffs maintain that defendants should have known as early as December, 1991, that their operating expenses would increase in 1992.

Plaintiffs' claims amount to allegations that defendants' failed to predict accurately its future rate of sales. The Court finds these allegations to be based solely on plaintiffs' characterizations rather than on fact.

### III.

■ Although plaintiffs' allegations may at first blush have the appearance of specificity, in substance they are conclusory and fail to provide an adequate factual basis for an inference of fraud and scienter. While plaintiffs allege ... a host of activities by defendant[s], they offer no basis for believing that those activities constituted the sophisticated fraud they allege.

*Juntti v. Prudential–Bache Sec., Inc.,* 993 F.2d 228 (4th Cir.1993). In this case, plaintiffs have illustrated with a great deal of specificity a number of statements and projections that later turned out to be overly optimistic. However, as *Dubowski* court noted:

> Plaintiffs repeatedly make bold assertions of misrepresentations and omitted facts— but do not claim facts to explain why the statements are misrepresentations. Why

were the statements false when made, and how were defendants to know?

763 F.Supp. at 172. Certainly, plaintiffs' amended complaint is more specific in its allegations than was the initial complaint. At argument on this amended complaint, plaintiffs' counsel informed the Court that this complaint was the best that they could draw in this case. Plaintiffs have failed in their amended complaint, however, to state the facts suggesting that defendants knew they were making false statements or adopting any allegedly false predictions of others. Thus, plaintiffs have pled fraud by hindsight, which is insufficient for purposes of stating a claim under Rule 10b–5. *DiLeo*, 901 F.2d at 627; *Denny*, 576 F.2d at 470; *Dubowski*, 763 F.Supp. at 172; *Berliner*, 783 F.Supp. at 712.

This Court finds that conclusory allegations, with nothing more, do not meet the requirements of Rule 9(b). Since the plaintiffs by their own admission cannot improve their complaint, the Court GRANTS defendants' motion and DISMISSES the amended complaint.

IT IS SO ORDERED.